UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIK WIKLUND,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>SOLITON, INC., BRAD HAUSER, CHRISTOPHER CAPELLI, WALTER KLEMP, JONATHAN FOSTER, DANIKA HARRISON, NIQUETTE HUNT, and MICHAEL KAMINER,<br><br>　　　　　　Defendants. | Case No.: 1:21-cv-05386<br><br>AMENDED COMPLAINT FOR AN EQUITABLE ASSESSMENT OF ATTORNEYS' FEES AND EXPENSES<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Erik Wiklund ("Plaintiff"), by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.　　This is an action brought by Plaintiff against Soliton, Inc. ("Soliton" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Soliton, the "Defendants") in connection with the materially incomplete and misleading proxy statement filed in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Defendants have now mooted Plaintiff's claims by filing supplemental disclosures which cured Defendants' previous disclosure violations and provided Soliton shareholders with information necessary to cast an informed vote on July 20, 2021 (the "Shareholder Vote"). Plaintiff now seeks attorneys' fees and expenses for securing a common benefit proportionally shared by

1

Soliton stockholders.

2.     Plaintiff's claims arose in connection with the proposed acquisition (the "Proposed Transaction") of Soliton by Allergan Aesthetics, an AbbVie company ("Parent").  Specifically, Soliton would be acquired by Parent through its wholly owned subsidiary, Scout Merger Sub, Inc. ("Merger Sub," collectively Parent and Merger Sub are referred to as "Abbvie").

3.     On May 8, 2021, Soliton's Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with AbbVie.  Pursuant to the terms of the Merger Agreement, Soliton's stockholders will receive $22.60 in cash for each share of Soliton common stock they own (the "Merger Consideration"), in an all-cash transaction valued at approximately $550 million.

4.     On June 15, 2021, in order to convince Soliton public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission (the "SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.     In particular, the Proxy contained materially incomplete and misleading information concerning: (i) Soliton's financial projections; and (ii) the financial analyses conducted by the financial advisors of the Company, Guggenheim Securities ("Guggenheim") in support of its fairness opinion and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

6.     On June 18, 2021, Plaintiff filed his complaint in the above-captioned action against Defendants for their violations of Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a) and 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 (the "Complaint").

7.     On June 20, 2021, counsel for Plaintiff reached out to counsel for Defendants rwith a copy of the Complaint. The next day, counsel for Defendants accepted service of the Complaint.

Thereafter, Plaintiff sent waivers of service to Defendants and awaits its execution.

8. On July 15, 2021 and in advance of the Shareholder Vote, Defendants filed a 10-page document with the SEC in DEFA14A – Definitive Additional Materials to the Proxy that remedy and mooted Plaintiff's claims raised on June 18, 2021 Action (the "Supplemental Disclosures"), and thereby conferring a substantial, common benefit on Soliton stockholders. The Supplemental Disclosures provided Soliton stockholders with plainly material information that was required to be disclosed to prevent violations of federal securities laws.

9. Armed with the Supplemental Disclosures, Soliton stockholders were able to fairly understand the Merger Agreement and Proposed Transaction, and so were able to cast a fully informed Shareholder Vote. The Shareholder Vote approved the proposed Transaction.

10. Plaintiff now amends his Complaint to seek an equitable assessment of attorneys' fees and expenses. The Supplemental Disclosures contained material information and were disclosed as a result of Plaintiff's litigation efforts. Therefore, Plaintiff and his counsel have conferred a substantial benefit upon Soliton stockholders, entitling Plaintiff's counsel to an award of fees and expenses in an amount to be determined by the Court or the trier of fact in addition to reimbursement for their actual out-of-pocket costs. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 396 (1970); *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores*, 54 F.3d 69, 71 (2d Cir. 1995).

## JURISDICTION AND VENUE

7. This Court had jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9. Moreover, the Court has ancillary jurisdiction for an award for attorneys' fees and expenses as result of Defendants actions to moot the claims raised in this action on June 18, 2021.

8. Personal jurisdiction exists over each Defendant either because the Defendant

conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Exchange Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Soliton's common stock trades on the Nasdaq Stock Market ("NASDAQ"), which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Moreover, Soliton's proxy solicitor, Saratoga Proxy Consulting, LLC, financial advisor, Guggenheim, and legal advisor, Skadden, Arps, Slate, Meagher & Flom LLP, are all headquartered in this District.

## PARTIES

10. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Soliton common stock.

11. Defendant Soliton is a public company incorporated under the laws of Delaware with principal executive offices located at 5304 Ashbrook Drive, Houston, Texas 77081. Soliton's common stock is traded on NASDAQ under the ticker symbol "SOLY."

12. Individual Defendant Brad Hauser ("Hauser") has been a Director of the Company at all relevant times. Hauser also serves as the Company's President and Chief Executive Officer

4

("CEO").

13. Individual Defendant Christopher Capelli ("Capelli") has been a director of the Company at all relevant times. Capelli also serves as the Company's Vice Chairman of the Board and Chief Science Officer.

14. Individual Defendant Walter Klemp ("Klemp") has been a director of the Company at all relevant times. Klemp also serves as the Company's Executive Chairman of the Board.

15. Individual Defendant Jonathan Foster ("Foster") has been a director of the Company at all relevant times.

16. Individual Defendant Danika Harrison ("Harrison") has been a director of the Company at all relevant times.

17. Individual Defendant Niquette Hunt ("Hunt") has been a director of the Company at all relevant times.

18. Individual Defendant Michael Kaminer ("Kaminer") has been a director of the Company at all relevant times.

19. The defendants identified in paragraphs 12 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Soliton, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.      Background of the Company and the Proposed Transaction**

20. Soliton is a medical device company with a novel and proprietary platform technology licensed from The University of Texas on behalf of MD Anderson Cancer Center. Soliton's first FDA cleared commercial product, the Rapid Acoustic Pulse ("RAP") device, will use rapid pulses of acoustic shockwaves as an accessory to lasers for the removal of unwanted tattoos and the treatment of cellulite. The Company believes this "Soliton" method has the potential to lower tattoo removal costs for patients, while increasing profitability to practitioners, compared to current

laser removal methods. Soliton is investigating potential additional capabilities of the RAP technology. The device is currently cleared in the United States only for use in tattoo removal and cellulite.

21. On May 8, 2021, Soliton's Board caused the Company to enter into the Merger Agreement with AbbVie. Under the Merger Agreement, AbbVie, upon the terms and subject to the conditions set forth in the Merger Agreement, will acquire Soliton for approximately $550 million in cash. Specifically, Soliton's stockholders will receive $22.60 in cash for each share of Soliton common stock they own.

22. On May 10, 2021, Defendants and AbbVie issued a joint press release announcing the Proposed Transaction, which stated in relevant part:

> **Allergan Aesthetics to Acquire Soliton, Expanding Body Contouring Portfolio**
>
> **— Acquisition adds Rapid Acoustic Pulse technology platform for improvement in appearance of cellulite in the buttocks and thighs —**
>
> IRVINE, Calif. and HOUSTON, May 10, 2021 – Allergan Aesthetics, an AbbVie company (NYSE: ABBV) and Soliton (NASDAQ: SOLY) today announced a definitive agreement under which Allergan Aesthetics will acquire Soliton and RESONIC™, its Rapid Acoustic Pulse device which recently received U.S. Food and Drug Administration (FDA) 510(k) clearance and is a non-invasive treatment for the short-term improvement in the appearance of cellulite. The acquisition of Soliton expands and complements Allergan Aesthetics' Body Contouring treatment portfolio which includes CoolSculpting® Elite.
>
> The novel platform technology uses non-invasive rapid, high-frequency sound waves to disrupt targeted cellular structures and connective tissue, physically impacting the fibrous septae beneath the skin that contribute to the dimpled appearance of cellulite. In clinical trial data submitted to the FDA, after a single treatment session RESONIC™ demonstrated significant improvement and strong patient satisfaction with 92.9 percent of subjects agreeing or strongly agreeing their cellulite appeared improved.
>
> "There is a huge unmet need to address cellulite and effective treatments have been elusive and frustrating for consumers," said Carrie Strom, President, Global Allergan Aesthetics and Senior Vice President, AbbVie. "Soliton's technology offers a new, completely non-invasive approach with

clinically-proven results to reduce the appearance of cellulite with no patient downtime. The addition of this technology complements Allergan Aesthetics' portfolio of body contouring treatments. Health care providers will now have another option to address consumers' aesthetic concerns."

"Allergan Aesthetics' brand recognition, global footprint, track record and commitment to developing best-in-class aesthetic treatments makes the Company ideally suited to maximize the commercial potential of the RESONICTM rapid acoustic pulse technology," said Walter Klemp, Executive Chairman, Soliton. "I am proud of the passion and accomplishments of the Soliton team and thankful for the ongoing support of our investors which have culminated in this transaction. We look forward to working with Allergan Aesthetics to ensure a successful completion of this transaction."

Under the terms of the transaction, Allergan Aesthetics will pay $22.60 per share in cash for each outstanding share of Soliton. Soliton's enterprise value for the transaction is approximately $550 million and was approved by the Boards of Directors of both companies. The transaction is subject to customary closing conditions, including clearance by the U.S. antitrust authorities under the Hart-Scott-Rodino Act and approval of Soliton's shareholders. Guggenheim Securities served as financial advisor to Soliton and Hogan Lovells served as legal counsel to Soliton.

RESONICTM has also received FDA 510(k) clearance for use in conjunction with laser for tattoo removal and has demonstrated clinical results in fibrotic scars.

**II.      The Proxy Omitted Material Information**

23.     On June 15, 2021, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresented or omitted material information that was necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

     A.     <u>Materially Misleading Statements and Omissions Regarding Soliton's Financial Projections</u>

24.     The Proxy failed to provide material information concerning financial projections by Soliton management and relied upon by the Board in recommending the Proposed Transaction

and Guggenheim in performing its financial analysis to issue its fairness opinion. The Proxy disclosed management-prepared financial projections for the Company which are materially misleading. The Proxy states that in connection with the Board's approval of the Proposed Transaction and Guggenheim rendering of its fairness opinion, Soliton's management prepared non-public financial projections for three illustrative scenarios – the "Base Case Scenario," the "Moderate Growth Scenario" and the "Outperform Scenario" – containing certain unaudited prospective financial information regarding Soliton's operations for the fiscal years ending December 31, 2021 through December 31, 2026 (collectively, the "Soliton Projections") and provided them to the Board and the financial advisors with forming a view about the stand-alone valuation of the Company. Accordingly, the Proxy should have, but failed to provide, certain information in the projections that Soliton management provided to the Board and the financial advisors.  Proxy pages 54-56.

25. With respect to the Base Case Scenario of the Soliton Projections, the Proxy provided values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: EBITDA, and Unlevered Free Cash Flow. The Proxy, however, failed to provide: (i) the line items underlying Soliton's Unlevered Free Cash Flow; (ii) the line items used to calculate Soliton's EBITDA; and (iii) a reconciliation of all non-GAAP to GAAP metrics.

26. Likewise, with respect to the Moderate Growth Scenario of the Soliton Projections, the Proxy provided values for non-GAAP financial metrics: EBITDA, and Unlevered Free Cash Flow. The Proxy, however, failed to provide: (i) the line items underlying Soliton's Unlevered Free Cash Flow; (ii) the line items used to calculate Soliton's EBITDA; and (iii) a reconciliation of all non-GAAP to GAAP metrics.

27. With respect to the Outperform Scenario of the Soliton Projections, the Proxy provided values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: EBITDA, Unlevered Free Cash Flow and Probability of Success Adjusted Unlevered Free Cash

Flow. The Proxy, however, failed to provide: (i) the line items underlying Soliton's Unlevered Free Cash Flow; (ii) the line items used to calculate Soliton's EBITDA; (iii) the line items underlying Soliton's Probability of Success Adjusted Unlevered Free Cash Flow; and (iv) a reconciliation of all non-GAAP to GAAP metrics.

28. The omission of this information rendered the projections disclosed by Defendants a mis-leading half-truth and thereby a direct violation of Regulation G and consequently Section 14(a).

29. When a company discloses non-GAAP financial measures in a Proxy that were relied on by a board of directors to recommend that stockholders exercise their corporate voting rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation, whether by a schedule or other understandable method, of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

30. Defendants' failure to disclose the line items used to calculate EBITDA, Unlevered Free Cash Flow and Probability of Success Adjusted Unlevered Free Cash Flow, or to provide the requisite reconciliation of all non-GAAP to GAAP metrics similarly rendered the Proxy materially misleading.

31. Investors are concerned, perhaps above all else, with the projections and cash flows of the companies in which they invest. Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to answer in determining whether to vote in favor of the Proposed Transaction is clear: Is the Merger Consideration fair compensation given Soliton's projected cash flows? Without the line items underlying Soliton's unlevered free

cash flows the Company's shareholders will not be able to properly assess this critical question and evaluate the fairness of the Merger Consideration.

32. For this reason, Courts have recognized that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

33. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124-1125 (8th Cir. 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the projections relied upon by Guggenheim, but have omitted crucial line items and reconciliations. Thus, Defendants' omission renders the projections disclosed on page 48 of the Proxy misleading.

      B. <u>Materially Incomplete and Misleading Disclosures Concerning Guggenheim's Financial Analyses</u>

34. With respect to Guggenheim's *Discounted Cash Flow Analysis* for Soliton, the Proxy also failed to disclose: (i) the unlevered free cash flows underlying the analysis; (ii) the projected terminal values for the Company; (iii) the inputs and assumptions underlying the range of discount rates ranging from 11.55% – 14.30%; (iv) Soliton's weighted average cost of capital; and (v) the inputs and assumptions underlying the perpetual growth rate range of 2.0% to 3.0%. Proxy pages 48-49.

35. These key inputs are material to Soliton shareholders, and their omission renders the summary of Guggenheim' *Discounted Cash Flow Analysis* incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, Soliton's shareholders cannot evaluate for themselves the reliability of Guggenheim's *Discounted Cash Flow Analysis*, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or was the result of an unreasonable judgment by Guggenheim, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

36. With respect to Guggenheim's *Premia/(Discounts) Paid in Selected Precedent Merger and Acquisition Transactions* analysis, the Proxy failed to disclose: (i) the dates of the closing of each transaction observed in the analysis; (ii) the acquired companies' closing share price on the last trading day prior to announcement of the observed transactions; and (iii) the basis for selecting the representative range of premia. Proxy pages 51-52.

11

37. With respect to Guggenheim's *Wall Street Equity Research Analyst Stock Price Targets* analysis, the Proxy failed to disclose: (i) the identity of the analysts observed; and (ii) the price targets utilized. Proxy page 52.

38. In sum, the omission of the above-referenced information rendered the Proxy materially incomplete and misleading, in contravention of the Exchange Act.

### III. Plaintiff Obtained Material Information Omitted From The Proxy, Thereby Conferring A Substantial Benefit

39. On July 15, 2021, Soliton filed Supplemental Disclosures with the SEC, after Plaintiff filed his Complaint, directly addressing the issues raised:

**SUPPLEMENT TO PROXY STATEMENT**

**The section of the Definitive Proxy Statement entitled "The Merger—Opinion of Financial Advisor" is amended and supplemented as follows:**

   11. *The following supplemental disclosure replaces in its entirety the second and third bullet points in the last paragraph beginning on page 48 of the Definitive Proxy Statement:*

   Guggenheim Securities used a discount rate range of 11.55% – 14.30% based on its estimate of Soliton's weighted average cost of capital. **The weighted average cost of capital was estimated based on Guggenheim Securities' (i) investment banking and capital markets judgment and experience in valuing companies similar to Soliton and (ii) application of the capital asset pricing model with the following specific inputs: (a) Guggenheim Securities' then-current estimate of the prospective U.S. equity risk premium range (i.e., 5.50% – 6.50%), (b) Guggenheim Securities' review of Soliton's Bloomberg one-year adjusted equity betas and Soliton's Barra predicted equity betas as well as similar equity beta information for Soliton's selected peer group companies (including, in addition to Bloomberg one-year adjusted equity betas, Bloomberg two-year and five-year adjusted equity betas) which resulted in a prospective unlevered equity beta reference range for Soliton of 1.300 – 1.500, (c) the then-prevailing yield on the 20-year US Treasury bond (i.e., 2.17%) as a proxy for the risk-free rate, and (d) Soliton's assumed forward-looking capital structure and (e) an estimate of the appropriate size/liquidity premium for Soliton on a stand-alone basis (i.e., 2.40%).**

   In estimating Soliton's terminal/continuing value for purposes of its discounted cash flow analysis, Guggenheim Securities used a perpetual growth rate range of 2.0% to 3.0%, which range was selected based on Guggenheim Securities' professional judgment and experience. Guggenheim Securities applied a two-stage methodology to calculate the terminal value, which was discussed with Soliton's senior management. **Based on the direction of Soliton's senior management,** during the first stage of the terminal value, **unlevered** free cash flow growth decelerates linearly**, starting from the observed growth rate in 2026, the last year of Soliton's management's forecasts,** ~~to the assumed~~ **and ending with an unlevered free cash flow** ~~perpetuity~~ growth rate **of 2.5% in the last year of the first state, 2031 for the Base Case Scenario and Moderate Growth Scenario, and 2030 for the Outperform Scenario**. **These unlevered free cash flows were discounted to present utilizing Guggenheim's discount rate range.** ~~and~~ Thereafter the perpetuity growth rate is applied **with the terminal free cash flow also being discounted by Guggenheim's calculated discount rate range**. ~~Based on the direction of Soliton's senior management, the first stage of the terminal value for the Base Scenario and the Moderate Growth Scenario ends in 2031, while the first stage of the terminal value for the Outperform Scenario ends in 2030.~~

**12.** *The following supplemental disclosure replaces in its entirety the table labeled "Premia / (Discounts) Paid in Selected Precedent Merger and Acquisition Transactions" beginning on page 52 of the Definitive Proxy Statement:*

Premia / (Discounts) Paid in Selected Precedent Merger and Acquisition Transactions

| Date Announced | Acquiror | Target Company | Premium to 1 Day | Premium to 52-Week High |
|---|---|---|---|---|
| 12/17/20 | Alphatec Holdings, Inc | EOS Imaging SA | 42% | (0%) |
| 7/30/20 | PAI Partners SAS | Amplitude Surgical SAS | 55 | 43 |
| 7/15/20 | Medtronic Plc | Medicrea International SA | 39 | 15 |
| 3/12/19 | Smith & Nephew PLC | Osiris Therapeutics, Inc. | 1 | (0) |
| 2/12/19 | Edwards Lifesciences Corp. | CAS Medical Systems, Inc. | 56 | (8) |
| 9/11/18 | Stryker Corp. | Invuity, Inc. | 29 | (21) |
| 4/10/18 | Altaris Capital Partners LLC | Analogic Corp. | 25[(1)] | (12)[(1)] |
| 3/12/18 | LABORIE Medical Technologies, Inc. | Cogentix Medical, Inc. | 14 | 1 |
| 12/7/17 | Stryker Corp. | Entellus Medical, Inc. | 50 | 0 |
| 12/4/17 | TPG Capital LLC | Exactech, Inc. | 54[(2)] | 18[(2)] |
| 6/9/17 | Stryker Corp. | Novadaq Technologies, Inc. | 49 | (28) |
| 4/3/17 | Apax Partners | Syneron Candela | 18[(3)] | 13[(3)] |

Premia / (Discounts) Paid in Selected Precedent Merger and Acquisition Transactions

| Date | Acquiror | Target Company | Premium to 1 Day | Premium to 52-Week High |
|---|---|---|---|---|
| 1/11/17 | Integra LifeSciences Holdings Corp. | Derma Sciences, Inc. | 40 | 1 |
| 12/2/16 | Teleflex Incorporated | Vascular Solutions | 2 | 0 |
| 9/27/16 | Boston Scientific Corp. | EndoChoice Holdings, Inc. | 90 | (35) |
| 5/2/16 | RoundTable Healthcare Management, Inc. | Symmetry Surgical, Inc. | 26 | 23 |
| 11/20/15 | CR Bard, Inc. | Liberator Medical Holdings, Inc. | 26 | (13) |
| 11/20/15 | Valeant Pharmaceuticals | Synergetics USA, Inc. | 71 | 14 |
| 6/18/15 | XIO (UK) LLP | Lumenis Ltd. | 16 | 3 |
| **Statistical Summary** | | | | |
| Mean | | | 37% | 1% |
| Median | | | 39% | 0% |
| 25th Percentile | | | 21% | (10%) |
| 75th Percentile | | | 52% | 13% |

(1) **Represents premiums since last unaffected trading day of 6/8/17 before strategic alternative announcement.**
(2) **Represents premiums since last unaffected trading day of 10/23/17 before original acquisition announcement.**
(3) **Represents premiums since last unaffected trading day of 2/10/17 before press speculation on acquisition.**

**13.** *The following supplemental disclosure replaces in its entirety the first full paragraph beginning on page 52 of the Definitive Proxy Statement:*

*Wall Street Equity Research Analyst Stock Price Targets.* Guggenheim Securities reviewed selected Wall Street equity research analyst stock price targets for Soliton as published prior to May 7, 2021 (the last trading day prior to the announcement of the merger). **The Wall Street equity research analysts and their corresponding stock price targets for Soliton were Roth Capital Partners ($14.00 per share), Cantor Fitzgerald ($25.00 per share) and Maxim Group ($30.00 per share).** Guggenheim Securities noted that such Wall Street equity research analyst stock price targets for Soliton common stock were $12.40 to $26.55 per share on a present value basis using an illustrative discount rate of 13.0% (which reflected Guggenheim Securities' estimate of the midpoint of Soliton's cost of equity).

**The section of the Definitive Proxy Statement entitled "The Merger—Certain Unaudited Prospective Financial Information" is amended and supplemented as follows:**

**16.** *The following supplemental disclosure replaces in its entirety the section entitled "Base Case Scenario" beginning on page 55 of the Definitive Proxy Statement:*

*Base Case Scenario*

**The Base Case Scenario was based on numerous variables and assumptions, including the following: (i) the placement of approximately 250 RESONIC consoles in 2022, increasing to approximately 1,000 RESONIC consoles placed in 2026, (ii) domestic tattoo volume of 2.34 new patients per RESONIC console per month at the beginning of 2022, increasing to 2.75 new patients per RESONIC console per month by the end of 2026, (iii) domestic cellulite volume of 3.40 new patients per RESONIC console per month at the beginning of 2022, increasing to 6.00 new patients per RESONIC console per month by the end of 2026, (iv) international tattoo volume of 0.57 new patients per RESONIC console per month at the beginning of 2023, increasing to 2.25 new patients per RESONIC console per month by the end of 2026, and (v) international cellulite volume of 2.02 new patients per RESONIC console per month at the beginning of 2023, increasing to 4.00 new patients per RESONIC console per month by the end of 2026.**

The following table presents a summary of the Base Case Scenario for the calendar years ending 2021 through 2026 for Soliton on a standalone basis.

|  | Year Ending December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E |
|  | ($ in millions) | | | | | |
| **Revenue** | $ 2 | $ 28 | $ 70 | $ 125 | $ 175 | $ 244 |
| **Gross Profit** | 0 | 22 | 58 | 107 | 151 | 212 |
| **Operating Expenses:** | | | | | | |
| Research and Development | 8 | 8 | 8 | 8 | 12 | 16 |
| Selling and Marketing | 6 | 18 | 35 | 54 | 76 | 105 |
| General and Administrative | 13 | 15 | 19 | 21 | 22 | 25 |
| **EBITDA**[1] | (26) | (18) | (3) | 23 | 42 | 66 |
| Depreciation and Amortization | 1 | 1 | 1 | 1 | 1 | 1 |
| **Operating Income** | (27) | (19) | (4) | 22 | 41 | 65 |
| *Net Operating Profit After Tax*[2] | (21) | (19) | (4) | 15 | 27 | 43 |
| *Depreciation and Amortization*[2] | 1 | 1 | 1 | 1 | 1 | 1 |
| *Capital Expenditures*[2] | (1) | (0) | (0) | (1) | (2) | (2) |
| *(Increase)/Decrease in Working Capital*[2] | (2) | (3) | (4) | (6) | (6) | (8) |
| **Unlevered Free Cash Flow**[2][3][4] | (23) | (22) | (7) | 8 | 20 | 34 |

(1) EBITDA as used in this section entitled "—Certain Unaudited Prospective Financial Information" is defined as operating earnings (after deduction of stock-based compensation) before interest, taxes, depreciation and amortization. EBITDA is a non-GAAP financial performance measure and should not be used as an alternative to net income as an indicator of operating performance.
**(2) 2021E Net Operating Profit After Tax, Depreciation and Amortization, Capital Expenditures, (Increase)/Decrease in Working Capital and Unlevered Free Cash Flow represents Q2 – Q4 2021E.**
(3) Unlevered Free Cash Flow as used in this section entitled "—Certain Unaudited Prospective Financial Information" is defined as after-tax unlevered operating cash flow minus capital expenditures and changes in working capital. 2021E Unlevered Free Cash Flow represents Q2 – Q4 2021E.
**(4) The Base Case Scenario Unlevered Free Cash Flow terminal value was $117 million.**


**17.** *The following supplemental disclosure replaces in its entirety the section entitled "Moderate Growth Scenario" beginning on page 56 of the Definitive Proxy Statement:*

*Moderate Growth Scenario*

**The Moderate Growth Scenario was based on numerous variables and assumptions, including the following: (i) the placement of approximately 250 RESONIC consoles in 2022, increasing to**

14

**approximately 1,000 RESONIC consoles placed in 2026, (ii) domestic tattoo volume of 0.47 new patients per RESONIC console per month at the beginning of 2022, increasing to 0.55 new patients per RESONIC console per month by the end of 2026, (iii) domestic cellulite volume of 2.72 new patients per RESONIC console per month at the beginning of 2022, increasing to 4.80 new patients per RESONIC console per month by the end of 2026, (iv) international tattoo volume of 0.11 new patients per RESONIC console per month at the beginning of 2023, increasing to 0.45 new patients per RESONIC console per month by the end of 2026, and (v) international cellulite volume of 1.62 new patients per RESONIC console per month at the beginning of 2023, increasing to 3.20 new patients per RESONIC console per month by the end of 2026.**

The following table presents a summary of the Moderate Growth Scenario for the calendar years ending 2021 through 2026 for Soliton on a standalone basis.

|  | Year Ending December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E |
|  | ($ in millions, except per share values) | | | | | |
| **Revenue** | $ 2 | $ 27 | $ 63 | $ 109 | $ 145 | $ 195 |
| **Gross Profit** | 0 | 21 | 51 | 91 | 124 | 168 |
| **Operating Expenses:** | | | | | | |
| Research and Development | 8 | 8 | 8 | 8 | 11 | 15 |
| Selling and Marketing | 6 | 17 | 33 | 51 | 68 | 92 |
| General and Administrative | 13 | 15 | 19 | 21 | 21 | 23 |
| **EBITDA** | (26) | (20) | (8) | 11 | 23 | 39 |
| Depreciation and Amortization | 1 | 1 | 1 | 1 | 1 | 1 |
| **Operating Income** | (27) | (21) | (9) | 10 | 22 | 37 |
| Net Operating Profit After Tax | (21) | (21) | (9) | 7 | 15 | 25 |
| Depreciation and Amortization | 1 | 1 | 1 | 1 | 1 | 1 |
| Capital Expenditures | (1) | (0) | (0) | (1) | (2) | (2) |
| (Increase)/Decrease in Working Capital | (2) | (3) | (4) | (6) | (5) | (7) |
| **Unlevered Free Cash Flow**[(1)] | (23) | (23) | (12) | 0 | 8 | 17 |

(1) **The Moderate Growth Scenario Unlevered Free Cash Flow terminal value was $82 million.**

**18.** *The following supplemental disclosure replaces in its entirety the section entitled "Outperform Scenario" beginning on page 56 of the Definitive Proxy Statement:*

*Outperform Scenario*

**The Outperform Scenario was based on numerous variables and assumptions, including the following: (i) the placement of approximately 300 RESONIC consoles in 2022, increasing to approximately 1,100 RESONIC consoles placed in 2026, (ii) domestic tattoo volume of 2.34 new patients per RESONIC console per month at the beginning of 2022, increasing to 2.75 new patients per RESONIC console per month by the end of 2026, (iii) domestic cellulite volume of 3.40 new patients per RESONIC console per month at the beginning of 2022, increasing to 9.00 new patients per RESONIC console per month by the end of 2026, (iv) international tattoo volume of 0.57 new patients per RESONIC console per month at the beginning of 2023, increasing to 2.25 new patients per RESONIC console per month by the end of 2026, (v) international cellulite volume of 2.02 new patients per RESONIC console per month at the beginning of 2023, increasing to 6.00 new patients per RESONIC console per month by the end of 2026, and (vi) a 60% probability of success for launch of future skin laxity and keloid indications for the RESONIC console.**

The following table presents a summary of the Outperform Scenario for the calendar years ending 2021 through 2026 for Soliton on a standalone basis.

|  | Year Ending December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E |
|  | ($ in millions) | | | | | |
| **Revenue** | $ 2 | $ 32 | $ 80 | $ 148 | $ 221 | $ 333 |

15

| | | | | | | |
|---|---|---|---|---|---|---|
| **Gross Profit** | 0 | 25 | 166 | 127 | 193 | 294 |
| **Operating Expenses:** | | | | | | |
| Research and Development | 8 | 8 | 8 | 8 | 12 | 19 |
| Selling and Marketing | 6 | 19 | 38 | 59 | 88 | 133 |
| General and Administrative | 13 | 15 | 19 | 21 | 24 | 28 |
| **EBITDA** | (26) | (16) | 3 | 38 | 68 | 114 |
| Depreciation and Amortization | 1 | 1 | 1 | 1 | 1 | 1 |
| **Operating Income** | (27) | (17) | 2 | 37 | 67 | 113 |
| *Net Operating Profit After Tax* | (20) | (17) | 1 | 24 | 44 | 74 |
| *Depreciation and Amortization* | 1 | 1 | 1 | 1 | 1 | 1 |
| *Capital Expenditures* | (1) | (0) | (0) | (1) | (2) | (2) |
| *(Increase)/Decrease in Working Capital* | (2) | (3) | (4) | (6) | (7) | (11) |
| **Unlevered Free Cash Flow**[2] | (23) | (20) | (2) | 18 | 36 | 62 |
| **Probability of Success Adjusted Unlevered Free Cash Flow**[1],[3] | (23) | (20) | (2) | 18 | 35 | 58 |

(1) Assumes a 60% probability of success for the approval and successful commercial launch of future skin laxity and keloid indications.
(2) **The Outperform Scenario Unlevered Free Cash Flow terminal value was $164 million.**
(3) **The Outperform Scenario Unlevered Probability of Success Adjusted Free Cash Flow terminal value was $145 million.**

40. Armed with the Supplemental Disclosures, Soliton stockholders were able to fairly understand the Merger Agreement and Proposed Transaction and cast a fully informed Shareholder Vote. Therefore, under the common benefit doctrine, Plaintiff's counsel is entitled to attorneys' fees and expenses. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 396 (1970); *accord In re Xoom Corp. Stockholder Litig.*, No. 11263-VCG, 2016 Del. Ch. LEXIS 117, at *10 (Del. Ch. Aug. 4, 2016).

41. The information Plaintiff acquired was material to the vote, and so its disclosure created a benefit shared for all similarly situated stockholders. For example, previously the Proxy failed to disclose with respect to the Soliton Projections: (i) the line items underlying Soliton's Unlevered Free Cash Flow; (ii) the line items used to calculate Soliton's EBITDA; (iii) the line items underlying Soliton's Probability of Success Adjusted Unlevered Free Cash Flow; and (iv) a reconciliation of all non-GAAP to GAAP metrics. *See supra,* Point II. Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to answer in determining whether to vote in favor of the Proposed Transaction is clear: Is the Merger

Consideration fair compensation given Soliton's projected cash flows? Therefore, this provided shareholders with the ability to properly assess and evaluate the fairness of the Merger Consideration.

42. Likewise, with respect to Guggenheim's *Discounted Cash Flow Analysis* for Soliton, the Proxy also previously failed to disclose: (i) the unlevered free cash flows underlying the analysis; (ii) the projected terminal values for the Company; (iii) the inputs and assumptions underlying the range of discount rates ranging from 11.55% – 14.30%; (iv) Soliton's weighted average cost of capital; and (v) the inputs and assumptions underlying the perpetual growth rate range of 2.0% to 3.0%. These crucial inputs are material to Soliton shareholders, and their omission rendered the summary of Guggenheim' *Discounted Cash Flow Analysis* incomplete and misleading. Accordingly, the Supplemental Disclosures provided shareholders with full insight into Guggenheim's valuation process and the rationale underlying these choices in arriving at a final valuation.

43. In other words, Plaintiff's litigation efforts "provide[d] a necessary supplement to Commission action [,]" which was the very reason the Supreme Court held stockholders have a private right of action under Section 14(a). *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964) (noting that the SEC examines thousands of "proxy statements annually and each of them must necessarily be expedited. Time does not permit an independent examination of the facts set out in the proxy material.").

## COUNT I

**(Against All Defendants for an Equitable Assessment of Attorneys' Fees and Expenses)**

44. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45. Plaintiff filed a meritorious lawsuit, which sought information material to Soliton's

informed Shareholder Vote.

46. As a result of and to address Plaintiff's action, on July 15, 2021, Soliton provided the information sought by Plaintiff and material to the Shareholder Vote, as set forth in the Supplemental Disclosures. Therefore, Plaintiff has conferred a substantial benefit to Soliton's shareholders.

47. To date, Plaintiff's counsel has not received any fees for the benefit provided to Soliton's shareholders. Nor has counsel been reimbursed for their out-of-pocket expenses relating to securing the benefit.

48. Accordingly, Plaintiff's counsel is entitled to a fee in an amount to be determined by the Court or the trier of fact in addition to reimbursement for their actual out-of-pocket costs. The Individual Defendants and Soliton should pay Plaintiff's counsels' fees and reimburse their out-of-pocket expenses because it was, in the first instance, the Individual Defendants' duties and obligations to disclose all material information to Soliton's shareholders.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, expert fees and expenses; and

B. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

| | |
|---|---|
| Dated: July 27, 2021 | **MONTEVERDE & ASSOCIATES PC** |
| | By:   <u>*/s/ Juan E. Monteverde*</u> |
| |      Juan E. Monteverde (JM-8169) |
| |      The Empire State Building |
| |      350 Fifth Avenue, Suite 4405 |
| |      New York, NY 10118 |
| |      Tel: (212) 971-1341 |
| |      Fax: (212) 202-7880 |
| |      Email: jmonteverde@monteverdelaw.com |
| | |
| | *Attorneys for Plaintiff* |